

# Exhibit A



Lee A. Cirsch (State Bar No. 227668)
Michael Akselrud (State Bar No. 285033)
THE LANIER LAW FIRM, P.C.
21550 Oxnard St., 3rd Floor
Woodland Hills, California 91367
Telephone: (310) 277-5100
Facsimile: (310) 277-5103
Email: lee.cirsch@lanierlawfirm.com
michael.akselrud@lanierlawfirm.com

W. Mark Lanier (*pro hac vice* pending)
Richard D. Meadow (*pro hac vice* pending)
THE LANIER LAW FIRM, P.C.
6810 FM 1960 West
Houston, TX 77069
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
Email: mark.lanier@lanierlawfirm.com
    richard.meadow@lanierlawfirm.com

Michael S. Burg (*pro hac vice* pending)
David K. TeSelle (*pro hac vice* pending)
Seth A. Katz (*pro hac vice* pending)
BURG SIMPSON ELDREDGE HERSH &
JARDINE, P.C.
40 Inverness Dr. East
Englewood, CO 80112
Telephone: (303) 792-5595
Facsimile: (303) 708-0527
Email: MBurg@burgsimpson.com
    DTeselle@burgsimpson.com
    SKatz@burgsimpson.com

*Attorneys for Plaintiffs*

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

MAR 06 2018

Sherri R. Carter, Executive Officer/Clerk

By Shaunya Bolden, Deputy

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES

BC 6 9 6 3 6 3

| | |
|---|---|
| HERMELINDA LUNA, ALEXANDRIA HANKS ON BEHALF OF THE ESTATE OF TANIA D. HANKS, ETHEL HERRERA, JEANETTE JONES, BECKY CANZONERI, MARGARET REED and BRENDA VERSIC, <br><br> Plaintiffs, <br><br> v. <br><br> JOHNSON & JOHNSON, JOHNSON & JOHNSON CONSUMER INC., AND DOES 1-25, inclusive, <br><br> Defendants. | CASE NO: <br><br> 1. **VIOLATION OF HEALTH & SAFETY CODE §25249.5 (PROPOSITION 65)** <br> 2. **VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE §17200, ET SEQ.** <br> 3. **VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE §17500, ET SEQ.** <br><br> **JURY TRIAL DEMANDED** |

-1-

Complaint

Plaintiffs HERMELINDA LUNA, ALEXANDRIA HANKS ON BEHALF OF THE ESTATE OF TANIA D. HANKS, ETHEL HERRERA, JEANETTE JONES, BECKY CANZONERI, MARGARET REED and BRENDA VERSIC ("Plaintiffs") are informed and believe and on that basis allege as follows:

## NATURE OF ACTION

1.     This action seeks to remedy the continuing failure of Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, "Defendants") to warn California consumers of exposure to Asbestos and Talc Containing Asbestiform Fibers in their Johnson's talcum Baby Powder ("JBP") and Shower to Shower ("S+S") products, which are chemicals known to the State of California to cause cancer. Under the Safe Drinking Water and Toxic Enforcement Act of 1986, Health and Safety Code §25249.6, a.k.a "Proposition 65", businesses must provide persons with a "clear and reasonable warning" before exposing individuals to chemicals known to the State of California to cause cancer. The purpose of this requirement is to ensure that California citizens are made fully aware of the presence of toxins in consumer products, allowing them to make an informed choice/decision about whether or not to consume products with toxins known to cause cancer. Asbestos and Talc Containing Asbestiform Fibers exposures have occurred, and continue to occur, through the manufacturing, marketing, distribution, sale and use of JBP and S+S.

2.     This is a "Proposition 65", 17200 and 17500 action that seeks, among other things, injunctive relief, civil penalites, restitution, and disgorgement to remedy decades of Defendants' on-going failure to warn and otherwise negligent, reckless and/or knowing sale of JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers, as well as Defendants' failure to warn California consumers of the existence of, and the dangers/risk associated with, the use of JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers. This action further seeks to remedy Defendants' unfair, unlawful, and fradulent business practices, and to ensure that all California consumers are warned that they are being exposed to Asbestos and Talc Containing Asbestiform Fibers before purchasing and/or using JBP and S+S.

3.     Pursuant to Proposition 65, Plaintiffs further seek injunctive relief enjoining Defendants from the continued manufacturing, packaging, distribution, marketing and or sales of

-2-

COMPLAINT AND DEMAND FOR JURY TRIAL

JBP without clear and reasonable warnings regarding the risk of cancer posed by exposure to Asbestos and Talc Containing Asbestiform Fibers through the use of JBP and S+S. Plaintiffs seek an injunctive order compelling Defendants to bring their business practices into compliance with Proposition 65 by providing clear and reasonable warnings to each individual who has been in the past and who in the future may be exposed to Asbestos and Talc Containing Asbestiform Fibers through the use of JBP and S+S. Plaintiffs seek an injunction prohibiting Defendants from offering JBP and S+S in California without either removing the Asbestos and Talc Containing Asbestiform Fibers from JBP and S+S such that no Proposition 65 warning is necessary or providing clear and reasonable warnings.  Plaintiffs also seek an order compelling Defendants to identify and locate each individual person who in the past purchased JBP and S+S, and to provide to each such purchaser a clear and reasonable warning that the use of JBP and S+S will cause exposure to Asbestos and Talc Containing Asbestiform Fibers.

4. In addition to injunctive relief, and pursuant to Proposition 65, Plaintiffs seek an assessment of civil penalties of $2,500 per day, per violation (i.e. per every container of JBP and S+S manufactured, distributed, marketed and sold without the clear and reasonable warning required by law) to remedy Defendants' failure to provide clear and reasonable warnings regarding exposure to Asbestos and Talc Containing Asbestiform Fibers.

### PARTIES, VENUE AND JURISDICTION

5. This Court has jurisdiction over this action pursuant to the California Consutition, Article VI, §10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other courts." The statutes under which this action is brought do not specify any other basis for jurisdiction. The damages and restitution sough by Plaintiffs exceed the minimal jurisdiction limit of the Superior Court and will be established according to proof at trial.

6. At all relevant times, Plaintiffs HERMELINDA LUNA, ALEXANDRIA HANKS ON BEHALF OF THE ESTATE OF TANIA D. HANKS, ETHEL HERRERA, JEANETTE JONES, BECKY CANZONERI, MARGARET REED and BRENDA VERSIC (collectively,

Plaintiffs") are and were citizens of the State of California and purchased JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers in the State of California. At all relevant times, JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers was manufactured and packaged in one centralized location from the same raw talc and shipped to all fifty states. Thus, consumers that purchased and used JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers in any of the other 49 states outside of California would be exposed to the same talc containing Asbestos and Talc Containing Asbestiform Fibers as a consumer that purchased JBP and S+S in California, and vice versa.

7.    Defendant Johnson & Johnson is a New Jersey corporation that is transacting and conducting substantial business within the State of California.

8.    At all pertinent times, Johnson & Johnson was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers. At all pertinent times, Johnson & Johnson regularly transacted, solicited, and conducted business in all States of the United States, including the State of California.

9.    Johnson & Johnson has derived substantial revenue from goods and products purchased and used in the State of California.  Johnson & Johnson expected or should have expected its acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

10.    Johnson & Johnson mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers without warnings to which Plaintiff and the consuming public in this State were exposed.

11.    Defendant Johnson & Johnson Consumer Inc. (f/k/a Johnson & Johnson Consumer Companies, Inc.) is a New Jersey corporation that is and was doing business in the State of New Jersey and in the State of California. Johnson & Johnson Consumer Inc. mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce JBP and S+S

-4-

COMPLAINT AND DEMAND FOR JURY TRIAL

containing Asbestos and Talc Containing Asbestiform Fibers without warnings to which Plaintiff and the consuming public in this State were exposed.

12.     Defendants DOES 1-25 are the fictitious names of corporations, partnerships or other business entities or organizations whose identities are not presently known and that participated in a conspiracy with other corporations, partnerships or other business entities or organizations, including the named Defendants herein, and/or mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold and/or otherwise placed in the stream of commerce JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers without warnings to which Plaintiff and the consuming public in this State were exposed.

13.     On August 23, 2017, Plaintiffs sent a 60-Day Notice of Violation of Proposition 65 ("Notice") to the requisite public enforcement agencies, and to the Defendants. A true and correct copy of the Notice is attached hereto as **Exhibit A** and incorporated by reference. The Notice was issued pursuant to, and in compliance with, the requirements of Health and Safety Code §25249.7(d) and the statute's implementing regulations regarding the notice of the violations to be given to certain public enforcement agencies and to the violater.

14.     More than 60 days have elapsed since Plaintiffs sent the Notice to Defendants. Additionally, the appropriate public enforcement agencies have failed to commence and diligently prosecute a cause of action under Health and Safety Code §25249.5, *et. seq.*, based upon the allegations herein.

15.     Venue is proper in the Court because, upon information and belief, all Defendants transact business in this County and the acts and ommissions alleged herein took place in this County.

## FACTUAL BACKGROUND

16.     For decades, Defendants have manufactured JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers that were and are continuing to be sold and marketed as safe for daily use by consumers to give off a pleasant smell, mask odors, prevent chaffing and/or

-5-

COMPLAINT AND DEMAND FOR JURY TRIAL

absorb moisture. Defendants' JBP and S+S products were advertised as healthful for babies, children and adults and to be applied regularly to maintain freshness, keep skin soft, mask odors with a floral fragrance, prevent chaffing and/or absorb moisture.

17.     Defendants and the Cosmetic, Toiletry & Fragrance Association (n/k/a Personal Care Products Council) ("CTFA") made false statements to Plaintiffs, the general public, news media and government agencies that exercise regulatory authority over the cosmetic industry, including, but not limited to, the U.S. Food & Drug Administration ("FDA"), the National Institute of Occupational Health and Safety ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), the Mine Health and Safety Administration ("MHS"), and the National Toxicology Program ("NTP"), which, in turn, proximately caused Plaintiffs' harm through intentional efforts to deceive the general public and regulatory authorities as to the safety of and presence of carcinogens, including Asbestos and Talc Containing Asbestiform Fibers in JBP and S+S.

18.     Defendants and CTFA, for decades, possessed medical and scientific data that raised concerns regarding the presence of carcinogens, including Asbestos and Talc Containing Asbestiform Fibers in JBP and S+S and that demonstrated the existence of health hazards to those exposed to Asbestos and Talc Containing Asbestiform Fibers in JBP and S+S.

19.     Talc is a hydrous magnesium silicate, inorganic material that is mined from the earth. It is used in the manufacture of goods, such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in JBP and S+S, talc is known as "talcum powder."

20.     Geologists, Defendants and CTFA—and their suppliers, experts, agents and advisors—have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. "Asbestos" is a commercial and legal term, rather than a geologic or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and amphibole minerals such as actinolite, anthophyllite, tremolite, amosite and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s, note

-6-

COMPLAINT AND DEMAND FOR JURY TRIAL

the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

21.     Defendants and their talc suppliers, which have been and still are the largest talc producers and/or talc-containing product manufactures in the world, admit that they have long employed and/or consulted with doctors, scientists, geologists, mineralogists and toxicologists, and that they have long maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of carcinogens, including asbestos and asbestiform talc, in talc and talc deposits.

22.     Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, silica, quartz, nickel and arsenic. Within the next several decades, an ever-growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer and death.

23.     Defendants and their affiliates, employees, agents and/or suppliers were members of the National Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and 45% tremolite, and the National Safety Council stated "The results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of *National Safety News*, an article entitled "No Halfway Measures in Dust Control" by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate

-7-

diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

24.     In 1936, the National Safety Council published an article entitled "Lesser Known Facts About Occupational Diseases" that found "exposure to asbestos fibers, present in the weaving and grinding of dry asbestos material, offers another type of dust which may cause fatalities among workers." In 1958, The New York Department of Labor published Industrial Code Rule No. 12 establishing regulations applying to all employees and employers relating to dangerous air contaminants and listing both asbestos and talc as such substances.

25.     In 1968, a study presented at the American Industrial Hygiene Conference & Exposition and published in the American Industrial Hygiene Association *Journal* concluded that "[a]ll of the 22 talcum products analyzed have a...fiber content...averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits...Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley, et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 AM. IND. HYG. ASSOC. J. 350-354 (1968). Defendants were aware of these findings.

26.     In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association. Defendants were aware of this study. The study revealed that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite and chrysotile. The study explained that such fibrous content was not unexpected because these types of fibers are often present in fibrous talc mineral deposits. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some talcum powders contained asbestos, there is no evidence that positive results or the brand names

-8-

COMPLAINT AND DEMAND FOR JURY TRIAL

of contaminated products were communicated to any governmental agency, the media or the public.

27.    ·  A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. TOXICOL. ENVIRON. HEALTH 255-284 (1976). The Mount Sinai study results were published by various newspapers, including the *New York Times* and the *Washington Post*, and Defendants were aware of same.

28.    In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on talc-containing products. Defendants and CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers (including Asbestos and Talc Containing Asbestiform Fibers hazards) associated with cosmetic talcum powder products, such as Defendants' JBP and S+S.

29.    In 1971, the New York City of Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction ("XRD") analysis, and found them to contain 5-25% tremolite and anthophyllite asbestos.

30.    Soon thereafter, a symposium was held in August of 1971 at the FDA to discuss the issue of asbestos content of talcum powders with the talc industry, government officials, and doctors and scientists from Mt. Sinai Hospital, which was then the epicenter of the medical and scientific study of asbestos. Among other statements, participants and attendees heard: that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable way to determine the asbestos content of talc and

-9-

talcum powder is through TEM and electron diffraction. Defendants and CTFA, aware of the foregoing and citing costs as well as their fear of the public learning talc was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test talc products to make sure they were free from asbestos, asbestiform talc and other carcinogens.

31.     After this 1971 symposium, Dr. Weissler of the FDA hired Dr. Seymour Z. Lewin to test commercially available talcum powders for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer Inc. The results, however, were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy, and electron diffraction must be used to detect asbestos in talc and talcum powders.

32.     Dr. Lewin of New York University disclosed twice in 1972 that asbestos had been found in cosmetic talc. In a report to the FDA on August 3, 1972, Dr. Lewin reported that of 195 talc products, 20 had tremolite, 7 had chrysotile, 9 had both tremolite and chrysotile, and 7 had substantial percentages of one of both. XRD had been used as the first step in analysis and the presence of asbestos and was verified by the use of optical microscopy to disclose the presence of significant numbers of fibers. Shortly thereafter, Dr. Lewin reported to Whittaker, Clark & Daniels Inc. on September 30, 1972, that Italian talc 1615 contained about 2% tremolite and 0.5% chrysotile as determined with XRD and detailed microscopic exam. In a July 31, 1973, review of Dr. Lewin's testing of 195 talc samples, the FDA found "good semi-quantitative agreement" for tremolite on selected samples re-analyzed using optical microscope analysis by FDA and XRD by Pfizer. Agreement was not as good for chrysotile, but the review did warn that optical microscopy could "completely miss the presence of chrysotile if the fibers are submicroscopic, which may well be the case in finely-milled talc." In 1972, ES Laboratories reported that "1615" talc contained 1% chrysotile and that "4615" talc contained 3% chrysotile and 3% anthophyllite. An August 23, 1973, report by Johns-Manville on TEM analysis of commercial talcs reported that nine of fourteen samples contained chrysotile. Only five samples did not have detectable levels of chrysotile. Pages from the laboratory notebook of Colgate-Palmolive Co. scientist Paul Briscese from March 7, 1976, show that Old Regal (North Carolina) talc tested positive for tremolite, New

-10-

Montana talc tested positive for anthophyllite and tremolite, and Italian talc tested positive for tremolite.

33.     A December 10, 1973, report of the CTFA's Talc Subcommittee disclosed that optical microscope analyses of talcs from the Italian, Montana I & II, Alabama, Vermont, and North Carolina mines had failed the proposed FDA's method because of elevated chrysotile concentrations. This December 10, 1973, CTFA report also showed that several laboratories had reported chrysotile in many of the talc samples sent by the CTFA for evaluation of analytical methods as well as the several identifications of asbestos in talc mentioned.

34.     In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, including Defendants and their talc suppliers, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Talc Defendants' products. On September 3, 1973, the FDA sent CTFA a letter regarding various means of measuring asbestos in talc, stating that "conventional methods employing X-ray diffraction or differential thermal analysis are not sufficiently reliable to produce quantitative results of the desired precision." The FDA further advised CTFA that it "has been exploring refractory optical microscopy as a means of measuring asbestos in talc." CTFA responded to the FDA's public notice on its proposed optical microscopy method on December 26, 1973. CTFA contended that the proposed method was not "reliable" for the detection of asbestos in talc, recommended a "collaborative effort between FDA and industry to develop such a method," and urged deferment of the proposed rule. Minutes of CTFA's Talc Subcommittee meeting on March 15, 1976, indicate that the FDA's "Dr. Shaffner suggested the possibility of having industry report periodically on the results of its analysis to the FDA." Dr. Estrin of CTFA responded that "the subcommittee would give serious consideration to this suggestion."

35.     Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed

COMPLAINT AND DEMAND FOR JURY TRIAL

rulemaking requiring talc used in food, food packing and drugs to be completely free of asbestos. These were some of the same "grades" of talc used by Defendants.

36.     The talc industry's response, including that of the Defendants, was swift and well-coordinated through CTFA, with which the Defendants conspired and worked in concert to purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos in talc and block efforts to label and warn consumers regarding the dangers associated with the talc products, including Defendants' JBP and S+S.

37.     Regarding the FDA's proposed 1972 rule-making, the FDA Director of Product Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a meeting in August of 1972 to discuss the results of Dr. Lewin's study and inform them that the FDA was preparing to release a "Proposed Statement of Policy On Asbestos in Cosmetics Containing Talc." Dr. Schaffner explained that he was duty-bound and must publicize the brand names of the talcum powders that contained asbestos. CTFA's president, Dr. Merritt, strongly objected to the FDA alerting the general public and publishing the brand names of the talcum powders, as it would cause the manufactures "economic hardship." Dr. Merritt also threatened to sue the FDA to prevent the disclosure of the brand names. As a result, the FDA, Defendants and CTFA never revealed or publicized the brand names of the talcum powders that contained asbestos, much to the detriment of the plaintiffs and the general public.

38.     In 1973, CTFA created a talc subcommittee and the Scientific Advisory Committee to develop a testing methodology for detecting asbestos in talc. Initially, CTFA designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated among the members, including representatives of Defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including the spiked sample), and one found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not optical microscopy, but rather TEM and electron diffraction. The same members,

COMPLAINT AND DEMAND FOR JURY TRIAL

however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite Defendants then owning or having unfettered access to same.

39.     From there, the difference between what Defendants and CTFA knew diverged from what they were representing to the FDA. Defendants, CTFA and others in the industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos could not be detected using the prevailing, most economic analytical methodology, XRD, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%.

40.     Defendants and the CTFA also did not disclose to the FDA that the overwhelming majority of talcum powder manufacturers and sellers were not testing their products for asbestos, and even if they were testing, it was done so superficially: only four or so grams per 20 tons of pre-shipment and pre-processed talc, as an example. Defendants and CTFA also failed to the inform the FDA that they were not testing off-the-shelf talc powder products, but rather old samples that were never from the end products themselves. They also failed to inform the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that are commonly found in talc deposits. What is more, to the extent Defendants found asbestos in their samples, these positive results were not reported to the FDA. Instead, on their behalf, CTFA sent letters to the FDA in March of 1976 fraudulently claiming that industry testing had shown all talcum powder products to be completely free of asbestos.

41.     Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt. Sinai School of Medicine, and the FDA became increasingly concerned that CTFA, Defendants and the cosmetic industries were slow to address the issue of asbestos in talc and talcum powders. Defendants had not issued any recalls, provided consumer warnings, informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, or developed a reliable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos or asbestiform-talc.

-13-

42.     Taking matters into their own hands, Mt. Sinai Hospital researchers published a follow-up article to Dr. Lewin's 1971 study that demonstrated that some of Defendants' talcum powders contained over 20% asbestos. The researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." The results of the Mount Sinai study were known to the Defendants and published the same year by the *New York Times* and the *Washington Post*.

43.     Defendants and CTFA responded to these developments by falsely claiming that the industry was doing "everything" it could to solve the problem; issuing press releases falsely claiming that chrysotile had never been found in talcum powders; and intentionally suppressing data that showed tremolite was commonly found in talc and talcum powder.

44.     CTFA subsequently began in earnest to produce a voluntary protocol and methodology that would provide Defendants cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder contained asbestos, Defendants and CTFA falsely represented that talcum powders have never contained asbestos or asbestiform-talc.

45.     Defendants, their talc suppliers, and third parties funded by Defendants collectively met with and corresponded with CTFA, as well as collectively met with the FDA and other government agencies, to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of talc to be used in consumer products. Defendants' "voluntary" method—that was developed collectively by Defendants and CTFA and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of the testing methods. Defendants and CTFA also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as JBP and S+S to which Plaintiff and the consuming public in this State were exposed.

-14-

COMPLAINT AND DEMAND FOR JURY TRIAL

46.     In support of its voluntary XRD methodology, which was finally published in 1977, CTFA produced letters to the FDA written by its members, including Defendants, identifying tests conducted showing talcum powder products did not contain asbestos. CTFA, Defendants and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens.

47.     CTFA "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published method, rather, relies on XRD with "the level of detection of amphibole by this method [being] 0.5% and above." CTFA met with and corresponded with Defendants and third parties, to individually and collectively advocate to the FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by TEM. This voluntary method was developed by CTFA and Defendants, and was advocated to the FDA by CTFA and Defendants in lieu of regulations requiring labeling and warnings on talcum powder products, even though CTFA and Defendants knew that the J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the CTFA's own J4-1 method. There is no evidence that CTFA or Defendants ever shared this remarkable failure with the FDA or the public.

48.     Minutes of CTFA's Talc Subcommittee from February 24, 1975, stated "It was agreed, however, that chrysotile is never found in cosmetic talcs, based on numerous analyses by several investigators…" When referring to the challenge of chrysotile detection, an article entitled "Talc" in the January/March 1976 CTFA *Cosmetic Journal*, states that "The only known backup method for a positive identification in this event, is [TEM] with selected area diffraction." However, "despite many efforts, the committee had been unable to find a sample of cosmetic talc containing naturally occurring asbestos…it was asked, 'Why should we test for chrysotile if there

-15-

isn't any?'" CTFA's Specification for Cosmetic Talc, revised on October 7, 1976, falsely represented that no fibrous asbestos was detected in cosmetic talc. Even after 1976, CTFA and Defendants continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos and other carcinogens in the talc being used to manufacture cosmetic products. However, CTFA and Defendants continued to represent that no asbestos was detected in cosmetic talc. These material representations adversely and directly impacted the FDA's attempt to adequately test consumer talc for asbestos and regulate cosmetics. The most sensitive method of identifying or detecting asbestos in cosmetic talc, TEM-SAED, was not used because CTFA represented that its "ultra sensitivity could be a problem" and that it was too expensive to use. Instead, its J4-1 method relied on XRD alone for detection of asbestos at greater concentrations than 0.5%, a concentration that could allow more than a billion asbestos fibers per gram of talc to be passed off as "asbestos-free."

49.     Defendants and CTFA made and published such representations, claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, including JBP and S+S, and that the talc reaching consumers, including JBP and S+S, was "safe," despite having substantial knowledge and evidence to the contrary. Defendants intentionally and knowingly did so to avoid FDA, CalEPA, OEHHA and other governmental agency regulations that, like California's Proposition 65, would have required them to place warnings regarding the Asbestos and Talc Containing Asbestiform Fibers content of their JBP and S+S products, and thereby inform the public in this State, including Plaintiffs, that JBP and S+S contain Asbestos and Talc Containing Asbestiform Fibers.

50.     CTFA then published an article in 1979 stating it conducted over three thousand tests of talcum powders and none of them found chrysotile. The article and report failed to disclose whether the talcum powders tested contained tremolite, anthophyllite or any other form of asbestos. This publication of half-truths was conveyed to the FDA and the public with the purpose of preventing regulations of cosmetic products. Thereafter CTFA's methodology became the standard by which nearly all talc was analyzed by the entire industry, including talc used in cosmetic and hygiene products today.

-16-

COMPLAINT AND DEMAND FOR JURY TRIAL

51.     CTFA and Defendants have represented to various news media outlets and the public at large that their products are "asbestos-free," when, in fact, their products did test positive for asbestos and those that did not were merely the result of inadequate and imprecise testing methods. "No asbestos detected" does not mean the product does not contain asbestos, but due to Defendants' repeated conflation of the terms, the public has been lead to erroneously believe talc products are safe. Furthermore, since Defendants and CTFA did not have sufficient testing protocols in place to support the claims that talc products, including JBP and S+S, were safe or asbestos-free, such statements were recklessly made, as they had no reason to believe them.

52.     Between 1970 and the 1990s, tests conducted by and on behalf of Defendants and the talc industry continued to show that talc and talcum powder products contained asbestos. None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of their existence is only because of civil litigation.  Defendants intentionally and knowingly did so to avoid FDA and California's Proposition 65 regulations that may have required them to place warnings regarding the asbestos content of their products, including JBP and S+S, and thereby inform the public, including Plaintiffs, that talc-containing products such as JBP and S+S contained Asbestos and Talc Containing Asbestiform Fibers.

53.     Defendants and CTFA's failure to disclose these positive results and the inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, even when various government agencies, including California's Environmental Protection Agency ("CalEPA") and Office of Environmental Health Hazard Assessment ("OEHHA") and others, raised concerns about the safety of talc, including the issue of asbestos content.

54.     To this day, many talc-containing products presently on the market, including JBP and S+S contain Asbestos and Talc Containing Asbestiform Fibers. Instead of publicizing this fact, Defendants and CTFA continue to deny all the above to protect their pecuniary interests, to the severe detriment of the public, including Plaintiffs.

55.     Since at least 1979, Defendants have conducted a campaign to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to

FDA regulations, and that talcum powder products are, therefore, safe. Nothing could be further from the truth: the FDA has never been assigned a budget by Congress to regulate cosmetics, including asbestos and other carcinogens in talcum powders. Defendants' concerns for the safety of their products have always been voluntary and under the auspices of CTFA, a private industry group, that in its 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States. Indeed, as of today, asbestos-containing talc in cosmetics has not been banned or otherwise regulated by CTFA or the FDA.

56.     Defendants (and other entities in the talc industry and cosmetic industries, including the CTFA), individually and collectively, failed to report to the FDA, CalEPA, OEHHA and other regulatory agencies, tests performed both internally and by outside laboratories confirming the presence of Asbestos and Talc Containing Asbestiform Fibers in both their finished products, including JBP and S+S, as well as talc shipments from suppliers Defendants obtained talc from and other sources that were used to produce finished products.

57.     Defendants, and even the outside laboratories, including McCrone Associates, sent letters to CTFA, to be and which were forwarded to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphibole or chrysotile asbestos, when in fact all of these entities had received or performed tests indicating the contrary when such false representations were made.

58.     After 1976, Defendants and CTFA continued to obtain and/or receive results of testing performed internally and externally indicating the presence of Asbestos and Talc Containing Asbestiform Fibers in JBP and S+S.

59.     Defendants failed to place any warning on their JBP and S+S despite CalEPA and OEHHA regulatiosn otherwise, or ever disclose the fact that these products contain Asbestos or Talc Containing Asbestiform Fibers, at any point, up to and including the present, despite the clear hazard and direct information that their JBP and S+S did and continue to contain Asbestos or Talc Containing Asbestiform Fibers.

60.     Defendants and CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture,

sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiffs, regarding the hazards of exposure to carcinogens, including Asbestos and Talc Containing Asbestiform Fibers, from JBP and S+S.

61.     Defendants and CTFA, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including JBP and S+S, to which Plaintiffs and the consuming public in this State have been exposed.

62.     Defendants and CTFA, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large in this State and elsewhere, including Plaintiffs, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

63.     Defendants and CTFA conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior:

        a.  to withhold from users of their products including Plaintiff and the general consuming public of this State—and from persons who they knew and should have known would be exposed thereto—information regarding the health risks of inhaling and/or ingesting and/or perineal (genital) application of JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers;

        b.  to eliminate, suppress or prevent investigation into the health hazards of exposure to asbestos and other carcinogens in talc and talcum powder products;

        c.  to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos and other carcinogens therein; and

        d.  to falsely represent that talc and talcum powder products, including those of

-19-

Defendants, were safe and healthful for use by consumers such as Plaintiffs and the general consuming public of this State.

64.     Plaintiffs reasonably and in good faith relied upon the false and fraudulent representations made by Defendants and CTFA regarding the hazards of talc and talcum powder products that contained asbestos and other carcinogens, and he was, therefore, deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

65.     CTFA, as well as Defendants and other entities in the talc industry and cosmetic industries, individually and collectively, failed to report to the FDA tests performed both internally and by outside laboratories confirming the presence of asbestos in Defendants' and other CTFA members' finished products as well as talc shipments from talc suppliers and other sources that were used to produce finished products. Instead, CTFA sent letters to the FDA stating that results of testing of talc used by the industry after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests indicating the contrary by 1976, when such intentionally false misrepresentations were made. CTFA and Defendants made and published such representations claiming that their collective testing method was adequate, they were ensuring that talcum powder products, including JBP and S+S, were safe, and that their testing of talc reaching consumers was "safe," despite knowing the contrary.

66.     The FDA, CalEPA, OEHHA, other regulatory bodies, and ultimately Plaintiffs and the general consuming public of this State, directly and/or indirectly relied upon CTFA's and Defendants' false representations regarding the safety of cosmetic talc. In fact, a FDA letter dated January 11, 1979, states: "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding CTFA's and Defendants' misrepresentations was obvious seven years later. In a response to a citizen petition to require an asbestos warning label on cosmetic talc, on July 11, 1986, the FDA states that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole..." CTFA's J4-1 method has continued for the past

COMPLAINT AND DEMAND FOR JURY TRIAL

four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc. The use of TEM, recognized by the CTFA as offering "greater sensitivity" for asbestos, continued to increase over the following decades as its advantages were applied to more matrices. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry, including Defendants, continues, four decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

67.    CTFA and Defendants, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, marketing, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information available to the public in this State regarding the hazards of exposure to Asbestos and Talc with Asbestiform Fibers and other carcinogens from talc and talc-containing products, including JBP and S+S.

68.    CTFA and Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including Plaintiffs and the general consuming public in this State, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion and/or perineal (genital) application of Asbestos and Talc Containing Asbestiform Fibers from their JBP and S+S products.

69.    CTFA and Defendants, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder, and specifically talc and talcum powder used in the production of JBP and S+S products to which Plaintiffs and the general consuming public in this State were exposed.

70.    CTFA and Defendants, through agreement and consciously parallel behavior, suppressed, altered, changed, destroyed and/or revised reports, data, tests, studies and other documents regarding the potential presence of asbestos and other carcinogens in talc and talc-

-21-

containing products, including Defendants' JBP and S+S products to which Plaintiffs and the consuming public in this State were exposed.

71.     As recently as 2016, Defendants made material misrepresentations to the FDA regarding Asbestos and Talc Containing Asbestiform Fibers in its talcum powder products.

72.     Plaintiffs file this lawsuit within one year of first suspecting that JBP and S+S products contain Asbestos and Talc Containing Asbestiform Fibers. Plaintiffs did not, and could not, by the exercise of reasonable diligence, discover at an earlier time that JBP and S+S contain Asbestos and Talc Containing Asbestiform Fibers due to the actions and/or inactions of Defendants. Plaintiffs did not suspect, nor did Plaintiffs have reason to suspect, the unlawful nature of the conduct of Defendants, until less than one year prior to the filing of this action. Additionally, Plaintiffs were prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public, regulatory agencies, the medical community, and the pharmacy profession that JBP and S+S products are "asbestos free", and Defendants have fraudulently concealed facts and information that could have led Plaintiffs to discover the basis for the causes of action alleged herein.

## PROPOSITION 65 ALLEGATIONS

73.     Plaintiffs bring the Proposition 65 claim in the public interest pursuant to California Health & Safety Code §25249.7(d).

74.     Health & Safety Code §25249.6 provides:

> No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual…

75.     "Knowingly" refers only to knowledge of the fact that a discharge of, release of, or exposure to a chemical listed pursuant to Section 25249.8(a) of the Act is occurring. "No knowledge that the discharge, release or exposure is unlawful is required (27 Cal. Code Regs, title 27, §25102(n)).

76.     Proposition 65 also provides that any person "violating or threatening to violate" the statute may be enjoined in a court of competent jurisdiction. (Health & Saf. Code §25249.7)

-22-

The phrase "threatening to violate" is defined to mean creating "a condition in which there is substantial likelihood that a violation will occur." (Health & Saf. Code §25249.11(e)). Violaters are liable for civil penalties of up to $2,500 per day for each violation of the Act. (Health & Saf. Code §25249.7).

77.     Asbestos is listed by the State of California as a chemical known to cause cancer. Asbestos is therefore subject to the "clear and reasonable" warning requirements of Proposition 65 for cancer.

78.     Due to the high toxity of Asbestos in causing cancer, the No Significant Risk Level ("NSRL") or ("Safe Harbor") for inhalation of Asbestos is 100 fibers/day (inhalation) (27 Cal. Code Regs, Title 27, CR 25709(b)). Defendants manufacture, distribute, market and/or sell in California JBP and S+S containing Asbestos in levels exceeding the NSRL for inhalation through normal and intended use of the products.

79.     There is no Safe Harbor established for perineal (genital) exposure to Asbestos.

80.     Talc Containing Asbestiform Fibers is also listed by the State of California as a chemical known to cause cancer. Talc Containing Asbestiform Fibers is therefore subject to the "clear and reasonable" warning requirements of Proposition 65 for cancer.

81.     There are no Safe Harbors established for exposure to Talc Containing Asbestiform Fibers.

82.     Since there is no established Safe Harbor for perineal (genital) exposure to Asbestos, or for inhalation or perineal (genital) exposure to Talc Containing Asbestiform Fibers, the named Defendants must demonstrate that the exposure will produce no observable effect, even at 1,000 times the level in question. *See*, 27 Cal. Code of Regs, Title 27, §25801 *et. seq.* Clearly, at 1,000 times the Asbestos and Talc Containing Asbestiform Fibers levels in question, the named Defendants are unable to show "no observable effect."

83.     At all times relevant to this action, Defendants have knowingly exposed California consumers to Asbestos and Talc Containing Asbestiform Fibers in the offending JBP and S+S talcum powder products without clear and reasonable warning to such individuals.

-23-

COMPLAINT AND DEMAND FOR JURY TRIAL

84.    At all times relevant to this action, Defendants have failed to place a clear and reasonable Proposition 65 warning for Asbestos and Talc Containing Asbestiform Fibers, disclosing the cancer-causing effects, on its JBP and S+S talcum powder products.

85.    At all times relevant to this action, Defendants' representatives have failed to warn California consumers that their JBP and S+S talcum powder products contain cancer-causing Asbestos and Talc Containing Asbestiform Fibers.

86.    At all times relevant to this action, Defendants have failed to place a clear and reaonsable Proposition 65 warning for Asbestos and Talc Containing Asbestiform Fibers on its marketing materials.

87.    At all times relevant to this action, Defendants have failed to place a clear and reasonable Proposition 65 warning for Asbestos and Talc Containing Asbestiform Fibers on store shelves.

88.    At all times relevant to this action, Defendants have failed to place a clear and reasonable Propositon 65 warning for Asbestos and Talc Containing Asbestiform Fibers on their websites.  To the contrary, Defendants continue to represent on their websites that JBP and S+S are "asbestos free."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF HEALTH & SAFETY CODE §25249.5, *ET SEQ.*
### (By Plaintiffs in the Public Interest Against all Defendants)

89.    Plaintiffs incorporate by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

90.    Proposition 65 (The Safe Drinking Water and Toxic Enforcement Act, California Health and Safety Code §25249.5, *et seq.*) is a "right-to-know" law. It requires businesses to warn California consumers before exposing them to chemicals known to cause cancer by including that information on their product's label. The intent of Proposition 65 is to protect California citizens from exposure to chemicals known to cause cancer, birth defects or other reproductive harm, and to inform California citizens about exposure to such chemicals.

-24-

COMPLAINT AND DEMAND FOR JURY TRIAL

91.     Plaintiffs are California residents bringing this Proposition 65 private enforcement action in the public interest.

92.     Proposition 65 requires the State of California to maintain and update a list of chemicals known by the state to cause cancer or reproductive toxicity. Two of the chemicals on that list are Asbestos and Talc Containing Asbestiform Fibers. If a listed chemical exists in a consumer product, such as JBP and S+S talcum powder products, the product must be labeled to disclose the existence of the toxic chemical to the general public.

93.     Proposition 65 also requires the State of California to keep a list of No Sigificant Risk Levels (NSRLs) and Maximum Allowable Dosage Levels (MADLs), which establish "safe harbor" levels for products contained listed toxic  chemicals. As to cancer, if the amount of the toxic chemical in the product is below the "safe harbor" limit, then it is exempt from liability under Proposition 65. The "safe harbor" limit for inhalation of Asbestos is 100 fibers/day.  There is no "safe harbor" for perineal (genital) exposure to Asbestos.  Nor is there any "safe harbor" for inhalation or perineal (genital) exposure to Talc Containing Asbestiform Fibers.  Each of the Defendants' JBP and S+S talcum powder products exceed the "safe harbor" provisions under Proposition 65, where a "safe harbor" has been established.  Further, since there is no established Safe Harbor for perineal (genital) exposure to Asbestos or to inhalation or perineal (genital) exposure to Talc Containing Asbestiform Fibers, the named Defendants must demonstrate that the exposure will produce no observable effect, even at 1,000 times the level in question. *See*, 27 Cal. Code of Regs, Title 27, §25801 *et. seq.* Clearly, at 1,000 times the Asbestos and Talc Containing Asbestiform Fibers levels in question, the named Defendants are unable to show "no observable effect."

94.     Defendants' JBP and S+S talcum powder products cause exposures to Asbestos and/or Talc Containing Asbestiform Fibers. Therefore, Propositon 65 requires Defendants to provide a clear and reasonable warning that the use of their JBP and S+S talcum powder products causes exposure to Asbestos and Talc Containing Asbestiform Fibers, chemicals known to the State of California to cause cancer. Defendants have failed to provide the required warnings.

95.     Plaintiffs are informed and reasonably believe that the Defendants knew and or reasonably should have known that the foreseeable and intended use of their JBP and S+S results

COMPLAINT AND DEMAND FOR JURY TRIAL

in exposure to Asbestos and/or Talc Containing Asbestiform Fibers, thus requiring warnings under Proposition 65.

96.     Defendants knew and intend that Plaintiffs will use their JBP and S+S talcum powder products, thus exposing Plaintiffs and the general consuming public in this State and elsewhere to Asbestos and Talc Containing Asbestiform Fibers.

97.     By manufacturing, supplying and distributing JBP and S+S talcum powder products containing Asbestos and Talc Containing Asbestiform Fibers without first providing a clear and reasonable warning, Defendants have engaged and continue to engage in conduct which violates Health and Safety Code §25249.6.

98.     Proposition 65 provides that any person "violating or threatening to violate" the statute may be enjoined by any court of competent jurisdiction. (Health & Saf. Code §25249.7).

99.     Violaters of Proposition 65 are liable for civil penalties of up to $2,500 per day per violation, recoverable in a civil ation. (Health & Saf. Code §25249.7(b)).

100.    Many containers of the JBP and S+S talcum powder manufactured, distributed and sold by the Defendants remain unopened and have not yet exposed a person to Asbestos and Talc Containing Asbestiform Fibers, but when opened, these containers will expose Plaintiffs and the general consuming public in this State and elsewhere to Asbestos and Talc Containing Asbestiform Fibers. These containers require "a clear and reasonable warning" prior to exposure.

101.    By engaging in this conduct, Defendants are liable, pursuant to§25249.7(b), for civil penalties of up to $2,500 per day per container of JBP and S+S sold.

102.    By continuing to engage in this conduct even after the Notice of Violation has been given, the Defendants have caused irreparable harm to the citizens of the State of California for which there is no plain, speedy or adequate remedy at law.

## SECOND CAUSE OF ACTION
### VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq.*
### (Against all Defendants)

103.    Plaintiffs hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

-26-

104.    California Business & Professions Code § 17200 provides that unfair competition shall mean and include "all unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

105.    Plaintiffs purchased JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers and have suffered injury in fact and have lost money or property as a result of the unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising.

106.    The acts and practices described above violate California Health and Safety Code §25249.5, *et seq.* (Proposition 65) and therefore satisfy and violate the "unlawful" prong of § 17200.

107.    The acts and practices described above also violate the California Safe Cosmetic Act of 2005 (Cal. Health & Safety Code §§ 111791 *et seq.*) for failing to notify the California Safe Cosmetics Program that JBP and S+S contain Asbestos and Talc Containing Asbestiform Fibers -- ingredients known to cause cancer.  The California Safe Cosmetics Act is a California State law that was enacted in 2005 and is implemented by the California Safe Cosmetics Program in the California Department of Public Health. The Act requires companies to report cosmetics products sold within the state that contain ingredients known or suspected to cause cancer, birth defects, or other reproductive harm.  The violations of Cal. Health & Safety Code §§ 111791 *et seq.* also satisfy and violate the "unlawful" prong of § 17200.

108.    The acts and practices described above were and are also likely to mislead the general public and therefore constitute unfair business practices within the meaning of California Business & Professions Code § 17200, including unfair, unlawful, and/or fraudulent practices.

109.    The acts of untrue and misleading advertising set forth in presiding paragraphs are incorporated by reference and are, by definition, violations of California Business & Professions Code § 17200. This conduct is set forth fully herein, and includes, but is not limited to: (a) Representing that JBP and S+S are safe for their intended and foreseeable use and "free of asbestos", knowing that said representations were false, and concealing that JBP and S+S contain Asbestos and Talc Containing Asbestiform Fibers and had a serious propensity to cause injuries

-27-

COMPLAINT AND DEMAND FOR JURY TRIAL

to users; (b) Issuing promotional literature and commercials deceiving potential users of the JBP and S+S by relaying positive information and concealing material relevant information regarding the safety and efficacy of JBP and S+ S; and other unfair, unlawful and fraudulent conduct.

110.    These practices constitute unlawful, unfair and/or fraudulent business acts or practices, within the meaning of California Business & Professions Code § 17200. The fraudulent conduct includes representing that JBP and S+S were safe for their intended use, and failing to warn of the risks Defendants were aware of.

111.    The unfair and unlawful conduct includes but is not limited to exposing Plaintiff and the general consuming public of this State to risks of ovarian cancer, mesothelioma and other cancers, without warning them, in order to profit from the sale of JBP and S+S in violation of the California Safe Cosmetics Act of 2005, Proposition 65, and other statutes and laws.

112.    The unlawful, unfair and fraudulent business practices of Defendants described above present a continuing threat to members of the public in that Defendants continue to engage in the conduct described therein.

113.    As a result of their conduct described above, Defendants have been and will be unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of hundreds of millions of dollars in ill-gotten gains from the sale of the JBP and S+S in California, sold in large part as a result of the acts and omissions described herein.

114.    Plaintiffs, pursuant to California Business & Professions Code § 17203, seeks an order of this court compelling the Defendants to provide restitutionary disgorgement and injunctive relief calling for Defendants, and each of them, to cease unfair business practices in the future.

115.    Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Plaintiffs and the general consuming public in this State.

**THIRD CAUSE OF ACTION**
**VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500, *et seq.***
**(Against all Defendants)**

-28-

COMPLAINT AND DEMAND FOR JURY TRIAL

116.    Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

117.    Plaintiff brings this cause of action pursuant to California Business & Professions Code § 17500. California Business & Professions Code § 17500 provides that it is unlawful for any person, firm, corporation or association to dispose of property or perform services, or to induce the public to enter into any obligation relating thereto, through the use of untrue or misleading statements.

118.    Plaintiffs purchased JBP and S+S containing Asbestos and Talc Containing Asbestiform Fibers and have suffered injury in fact and have lost money or property as a result of the unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising.

119.    At all times herein alleged, Defendants have committed acts of disseminating untrue and misleading statements as defined by California Business & Professions Code § 17500 by engaging in the following acts and practices with intent to induce members of the public to purchase and use JBP and S+S: (a) Representing that JBP and S+S are safe for their intended and foreseeable use and "free of asbestos", knowing that said representations were false, and concealing that JBP and S+S contain Asbestos and Talc Containing Asbestiform Fibers and have a serious propensity to cause injuries to users; (b) Issuing promotional literature and commercials deceiving potential users of JBP and S+S by relaying positive information and concealing material relevant information regarding the safety and efficacy of JBP and S+S; and other unfair, unlawful and fraudulent conduct.

120.    The foregoing practices constitute false and misleading advertising within the meaning of California Business & Professions Code § 17500.

121.    The acts of untrue and misleading statements by Defendants described herein above present a continuing threat to members of the public in that the acts alleged herein are continuous and ongoing, and the public will continue to suffer the harm alleged herein.

122.    As a result of their conduct described above, Defendants have been and will be unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of hundreds of

-29-

COMPLAINT AND DEMAND FOR JURY TRIAL

millions of dollars in ill-gotten gains from the sale of JBP and S+S in California, sold in large part as a result of the acts and omissions described herein.

123.    Pursuant to California Business & Professions Code § 17535, Plaintiffs seeks an order of this Court compelling the Defendants to provide restitution and injunctive relief calling for Defendants, and each of them, to cease unfair business practices in the future.

124.    Plaintiffs seek restitutionary disgorgment of the monies collected by Defendants, and each of them, and other injunctive relief to cease such false and misleading advertising in the future.

125.    Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the public and Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the general public, pray for judgment against Defendants as follows:

1.  For a declaratory judgment that Defendants' acted unlawfully by exposing Plaintiffs and consumers in this State of JBP and S+S to dangerous Asbestos and/or Talc Containing Asbestiform Fibers;

2.  For an order, pursuant to Health & Safety Code §25249.7(b), compelling Defendants to identify and locate each individual to whom the offending JBP and S+S talcum powder products were sold in the past four years, and to provide a warning to such persons that use of the offending JBP and S+S talcum powder products will expose them to chemicals known to cause cancer;

3.  For an order, pursuant to Health & Safety Code §25249.7(b) enjoining Defendants, their agents, employees, assigns and all persons acting in concert or participating with Defendants in the manufacture, distribution or sale of the offending JBP and S+S talcum powder products to (i) either remove all Asbestos and/or Talc Containing Asbestiform Fibers such that no Proposition 65 warning is necessary; or (ii) provide a

-30-

clear and reasonable warning, within the meaning of Proposition 65, to the consumers of JBP and S+S that may be exposed to Asbestos and/or Talc Containing Asbestiform Fibers causing an increased risk of cancer;

4. For an order requiring Defendants to make full disclosure of the risks of exposure to Asbestos and/or Talc Containing Asbestiform Fibers on the label of JBP and S+S talcum powder containers such that it complies with all applicable labeling rules and regulations;

5. For an order requiring Defendants to engage in corrective advertising regarding the conduct discussed above;

6. For assessment of civil penalties pursuant to Health & Safety Code §25249.7(b) against Defendants in the amount of $2,500 per day for each violation of Proposition 65;

7. For an order awarding, as appropriate, compensatory damages and restitutionary disgorgement to Plaintiffs;

8. For an order enjoining Defendants from continuing to market, advertise, distribute, and sell these products in the unlawful manner described herein, and ordering Defendants to engage in corrective action;

9. For all remedies available pursuant to the Civil Code;

10. For an order awarding attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5 or any other applicable provision(s) of law, as Plaintiffs shall specify in further application to the Court;

11. For an order awarding punitive damages;

12. For an order awarding pre- and post-judgment interest; and

13. For an order providing such relief as this Court deems proper.

Dated: March 5, 2018

Respectfully Submitted,

_____
Lee A. Cirsch (State Bar No. 227668)
Michael Akselrud (State Bar No. 285033)
THE LANIER LAW FIRM, P.C.
21550 Oxnard St., 3rd Floor
Woodland Hills, California  91367
Telephone: (310) 277-5100
Facsimile:  (310) 277-5103
Email: lee.cirsch@lanierlawfirm.com
           michael.akselrud@lanierlawfirm.com

W. Mark Lanier (*pro hac vice* pending)
Richard D. Meadow (*pro hac vice* pending)
THE LANIER LAW FIRM, P.C.
6810 FM 1960 West
Houston, TX 77069
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
Email:  mark.lanier@lanierlawfirm.com
           richard.meadow@lanierlawfirm.com

Michael S. Burg (*pro hac vice* pending)
David K. TeSelle (*pro hac vice* pending)
Seth A. Katz (*pro hac vice* pending)
BURG SIMPSON ELDREDGE HERSH &
JARDINE, P.C.
40 Inverness Dr. East
Englewood, CO 80112
Telephone:  (303) 792-5595
Facsimile:  (303) 708-0527
Email:  MBurg@burgsimpson.com
           DTeselle@burgsimpson.com
           SKatz@burgsimpson.com

*Attorneys for Plaintiff*

-32-

COMPLAINT AND DEMAND FOR JURY TRIAL

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims so triable in this action.

Dated:  March 5, 2018

Respectfully Submitted,

_____

Lee A. Cirsch (State Bar No. 227668)
Michael Akselrud (State Bar No. 285033)
THE LANIER LAW FIRM, P.C.
21550 Oxnard St., 3rd Floor
Woodland Hills, California  91367
Telephone: (310) 277-5100
Facsimile:  (310) 277-5103
Email: lee.cirsch@lanierlawfirm.com
            michael.akselrud@lanierlawfirm.com

W. Mark Lanier (*pro hac vice* pending)
Richard D. Meadow (*pro hac vice* pending)
THE LANIER LAW FIRM, P.C.
6810 FM 1960 West
Houston, TX 77069
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
Email:  mark.lanier@lanierlawfirm.com
            richard.meadow@lanierlawfirm.com

Michael S. Burg (*pro hac vice* pending)
David K. TeSelle (*pro hac vice* pending)
Seth A. Katz (*pro hac vice* pending)
BURG SIMPSON ELDREDGE HERSH &
JARDINE, P.C.
40 Inverness Dr. East
Englewood, CO 80112
Telephone:  (303) 792-5595
Facsimile:  (303) 708-0527
Email:  MBurg@burgsimpson.com
            DTeselle@burgsimpson.com
            SKatz@burgsimpson.com

*Attorneys for Plaintiff*

# Exhibit A



The Lanier
Law Firm

*A Professional Corporation*

**HOUSTON**
The Lanier Law Firm, PC
6810 Cypress Creek Parkway
Houston, TX 77069
(713) 659-5200
Fax (713) 659-2204

**LOS ANGELES**
The Lanier Law Firm, PC
10866 Wilshire Blvd.
Suite 400
Los Angeles, CA 90024
(310) 277-5100
Fax (310) 277-5103

**NEW YORK**
The Lanier Law Firm, PLLC
Tower 56
126 East 56th Street
6th Floor
New York, NY 10022
(212) 421-2800
Fax (212) 421-2878

lanierlawfirm.com

*Via Certified U.S. Mail*

THE ENTITIES AND THE PUBLIC ENFORCEMENT AGENCIES LISTED ON THE DISTRIBUTION LIST ACCOMPANYING THE ATTACHED CERTIFICATE OF SERVICE

**RE:   Notice of Violation of California Health & Safety Code § 25249.6**

To Whom It May Concern:

Becky Canzoneri, Tania Hanks, Ethel Herrera, Jeanette Jones, Hermelinda Luna, Margaret Reed, and Brenda Versic ("the Noticing Parties") serve this Notice of Violation ("Notice") on Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. ("the Noticed Parties") pursuant to and in compliance with California Health and Safety Code § 25249.7(d) and 27 California Code of Regulations § 25903.

This Notice satisfies a prerequisite for the Noticing Parties to commence an action against the Noticed Parties to enforce the Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"). The Noticing Parties intend to begin an enforcement action sixty (60) days after effective service of this Notice, unless the public enforcement agencies have commenced an action to rectify the violations discussed in this Notice. This Notice is being served upon the Noticed Parties, the California Attorney General and the district attorney of every county in which a violation is alleged to have occurred, and upon the city attorneys of any cities with populations according to the most recent decennial census of over 750,000 and in which the violation is alleged to have occurred. Where the Noticed Parties have a current registration with the California Secretary of State that identifies a Chief Executive Officer, President, or General Counsel of the corporation, the Notice is addressed to one of those persons.

Attached as Exhibit A to this Notice is a copy of the "The Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65): A Summary." The attached Summary was prepared by the California Environmental Protection Agency and provides general information about Proposition 65.

A description of Noticing Parties, the Noticed Parties, and the alleged violations address by this Notice are as follows:

The Noticing Parties: This Notice is provided by Becky Canzoneri, Tania Hanks, Ethel Herrera, Jeanette Jones, Hermelinda Luna, Margaret Reed, and Brenda Versic. The Noticing Parties are acting in the public interest pursuant to California Health & Safety Code § 25249.7(d) and are dedicated to protecting the health of all Californians. The Noticing Parties are located in Los Angeles, Riverside, Kern, Alameda, San Bernardino, and San Joaquin Counties in the State of California.

1

The Alleged Violators:  The Alleged Violators are the Noticed Parties.  Each of the Noticed Parties are believed to be in violation of California Health & Safety Code § 25249.6.

The Violation and the Chemicals Involved:

(a)  On February 27, 1987, the State of California officially listed Asbestos as a chemical known to the State to cause cancer.  The Noticed Parties have exposed and continue to expose consumers within the State of California to Asbestos without providing clear and reasonable warning of this exposure.  Such exposures have occurred and continue to occur at levels that exceed the No Significant Risk Level for inhalation.  There is no "Safe Harbor" (i.e. No Significant Risk Level) established for perineal (genital) exposure to Asbestos.

(b)  On April 1, 1990, the State of California officially listed Talc Containing Asbestiform Fibers as a chemical known to the State to cause cancer.  The Noticed Parties have exposed and continue to expose consumers within the State of California to Talc Containing Asbestiform Fibers without providing clear and reasonable warning of this exposure.  There is no "Safe Harbor" (i.e. No Significant Risk Level) established for exposure to Talc Containing Asbestiform Fibers.

The Consumer Products:  The products that are subject of this Notice are Johnson's Baby Powder and Shower to Shower products, all of which are produced, manufactured, marketed, and/or distributed by each of the Noticed Parties.

Route of Exposure:  The principal routes of exposure with regard to Asbestos and Talc Containing Asbestiform Fibers are through inhalation and perineal (genital) exposure.

The Duration of the Violations:  The violations addressed by this Notice began no later than February 27, 1987, have occurred on every day since at least February 27, 1987, and are ongoing and continuing.

Pursuant to Title 11 of the California Code of Regulations § 3100, a certificate of merit is attached hereto.

Please direct any inquiries regarding this Notice or any communication to the counsel for the Noticing Parties:

>     Lee A. Cirsch
>     The Lanier Law Firm, P.C.
>     10866 Wilshire Blvd.
>     Suite 400
>     Los Angeles, CA 90024
>     310.277.5100

2

DATED:  August 24, 2017

_____

Lee A. Cirsch
Attorney for Noticing Parties

## CERTIFICATE OF MERIT
### Health and Safety Code § 25249.7(d)

I, Lee A. Cirsch, hereby declare:

1)      This Certificate of Merit accompanies the attached sixty-day notice in which it alleged the parties identified in the notice have violated Health and Safety Code section 25249.6 by failing to provide clear and reasonable warnings.

2)      I am the attorney for the noticing parties.

3)      I have consulted with one or more persons with relevant and appropriate experience or expertise who has reviewed facts, studies, or other data regarding the alleged exposure to the listed chemicals that is the subject of the action.

4)      Based on the information obtained through those consultations, and on all other information in my possession, I believe there is a reasonable and meritorious case for the private action. I understand that "reasonable and meritorious case for the private action" means that the information providers a credible basis that all elements of the plaintiffs' case can be established and the information did not prove that the alleged violator will be able to establish any of the affirmative defenses set forth in the statute.

5)      The copy of this Certificate of Merit served on the Attorney General attaches to it factual information sufficient to establish the basis for this certificate, including the information identified in Health and Safety Code section 25249.7(h)(2), i.e., (1) the identity of the persons consulted with and relied on by the certifier, and (2) the facts, studies, or other data reviewed by those persons.


DATED:  August 24, 2017

_____
Lee A. Cirsch


4


45

## CERTIFICATE OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and a party to the within action. My business address is 10866 Wilshire Blvd., Suite 400, Los Angeles, CA 90024.

On August 24, 2017, I served the following:

1) 60-Day Notice of Intent to Sue Under Health & Safety Code section 25249.6

2) The Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65): A Summary (Noticed Parties Copies)

3) Certificate of Merit: Health & Safety Code section 25249.7(d)

4) Certificate of Merit (Attorney General Copy); Factual Information Sufficient to Establish the Basis of the Certificate of Merit

on the interested parties in this action by either electronically filing these documents or placing a true copy thereof enclosed in a sealed envelope addressed as listed on the Service List attached.

X   **MAIL** I am familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepared at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on August 24, 2017, at Los Angeles, California.

Michael Akselrud
Attorney for Noticing Parties

5

| Service List | | | | |
|---|---|---|---|---|
| Noticed Party | Address | City | State | Zip Code |
| Johnson & Johnson | One Johnson &Johnson Plaza | New Brunswick | NJ | 08933 |
| Johnson & Johnson Consumer Inc. | One Johnson &Johnson Plaza | New Brunswick | NJ | 08933 |
| Agency | Address | City | State | Zip Code |
| Office of the California Attorney General | Prop. 65 Enforcement Reporting | | | |
| Alameda County District Attorney | 1225 Fallon Street Room 900 | Oakland | CA | 94612 |
| Alpine County District Attorney | 270 Laramie Street P. O. Box 248 | Markleeville | CA | 96120 |
| Amador County District Attorney | 708 Court Street | Jackson | CA | 95642 |
| Butte County District Attorney | 25 County Center Drive | Oroville | CA | 95965 |
| Calaveras County District Attorney | 891 Mountain Ranch Road | San Andres | CA | 95249 |
| Colusa County District Attorney | 346 Fifth Street | Colusa | CA | 95932 |
| Contra Costa County District Attorney | 900 Ward Street | Martinez | CA | 94553 |
| Del Norte County District Attorney | 450 H Street Room 171 | Crescent City | CA | 95531 |
| El Dorado County District Attorney | 515 Main Street | Placerville | CA | 95667 |
| Fresno County District Attorney | 2220 Tulare Street, #1000 | Fresno | CA | 93721 |
| Glenn County District Attorney | P.O. Box 430 | Willows | CA | 95988 |
| Humboldt County District Attorney | 825 5th Street | Eureka | CA | 95501 |
| Imperial County District Attorney | 940 West Main Street Suite 102 | El Centro | CA | 92243 |
| Inyo County District Attorney | P.O. Drawer D | Independence | CA | 93526 |
| Kern County District Attorney | 1215 Truxtun Avenue | Bakersfield | CA | 93301 |
| Kings County District Attorney | 1400 West Lacey Boulevard | Hanford | CA | 93230 |
| Lake County District Attorney | 255 North Forbes Street | Lakeport | CA | 95453 |
| Lassen County District Attorney | 220 S. Lassen Street, Suite 8 | Susanville | CA | 96130 |

1

| Agency | Address | City | State | Zip Code |
|--------|---------|------|-------|----------|
| Los Angeles County District Attorney | 210 West Temple Street Suite 18000 | Los Angeles | CA | 90012 |
| Madera County District Attorney | 209 West Yosemite Avenue | Madera | CA | 93637 |
| Marin County District Attorney | 3501 Civic Center Drive Room 130 | San Rafael | CA | 94903 |
| Mariposa County District Attorney | 5101 Jones Street P. O. Box 730 | Mariposa | CA | 95338 |
| Mendocino County District Attorney | P.O. Box 1000 | Ukiah | CA | 95482 |
| Merced County District Attorney | 550 W. Main Street | Merced | CA | 95340 |
| Modoc County District Attorney | 204 S. Court Street Room 202 | Alturas | CA | 96101 |
| Mono County District Attorney | P.O. Box 617 | Bridgeport | CA | 93517 |
| Monterey County District Attorney | P.O. Box 1131 | Salinas | CA | 93902 |
| Napa County District Attorney | P.O. Box 720 | Napa | CA | 94559 |
| Nevada County District Attorney | 201 Commercial Street | Nevada City | CA | 95959 |
| Orange County District Attorney | 401 Civic Center Drive West | Santa Ana | CA | 92701 |
| Placer County District Attorney | 10810 Justice Center Drive Suite 240 | Roseville | CA | 95678 |
| Plumas County District Attorney | 520 Main Street Room 404 | Quincy | CA | 95971 |
| Riverside County District Attorney | 3960 Orange Street | Riverside | CA | 92501 |
| Sacramento County District Attorney | 901 G Street | Sacramento | CA | 95814 |
| San Benito County District Attorney | 419 4th Street Second Floor | Hollister | CA | 95203 |
| San Bernardino County District Attorney | 316 N. Mountain View Avenue | San Bernardino | CA | 92415 |
| San Diego County District Attorney | 330 W. Broadway Street | San Diego | CA | 92101 |
| San Francisco County District Attorney | 850 Bryant Street Room 322 | San Francisco | CA | 94103 |
| San Joaquin County District Attorney | P.O. Box 990 | Stockton | CA | 95201 |
| San Luis Obispo County District Attorney | 1035 Palm Street | San Luis Obispo | CA | 93408 |

| Agency | Address | City | State | Zip Code |
|---|---|---|---|---|
| San Mateo County District Attorney | 400 County Center Third Floor | Redwood City | CA | 94063 |
| Santa Barbara County District Attorney | 1112 Santa Barbara Street | Santa Barbara | CA | 93101 |
| Santa Clara County District Attorney | 70 West Hedding Street West Wing | San Jose | CA | 95110 |
| Santa Cruz County District Attorney | 701 Ocean Street Room 200 | Santa Cruz | CA | 95060 |
| Shasta County District Attorney | 1355 West Street | Redding | CA | 96001 |
| Sierra County District Attorney | 100 Courthouse Square Second Floor | Downieville | CA | 95936 |
| Siskiyou County District Attorney | P.O. Box 986 | Yreka | CA | 96097 |
| Bain Solano County District Attorney | 675 Texas Street Suite 4500 | Fairfield | CA | 94533 |
| Sonoma County District Attorney | 600 Administration Drive Room 212J | Santa Rosa | CA | 95403 |
| Stanislaus County District Attorney | 832 12th Street Suite 300 | Modesto | CA | 95354 |
| Adams Sutter County District Attorney | 446 Second Street | Yuba City | CA | 95991 |
| Tehama County District Attorney | 444 Oak Street, Room 1 | Red Bluff | CA | 96080 |
| Trinity County District Attorney | P.O. Box 310 | Weaverville | CA | 96093 |
| Tulare County District Attorney | 221 South Mooney Boulevard, Suite 224 | Visalia | CA | 93291 |
| Tuolumne County District Attorney | 423 North Washington Street | Sonora | CA | 95370 |
| Ventura County District Attorney | 800 South Victoria Avenue | Ventura | CA | 93009 |
| Yolo County District Attorney | 301 Second Street | Woodland | CA | 95695 |
| Yuba County District Attorney | 215 Fifth Street | Marysville | CA | 95901 |
| Office of the City Attorney, Los Angeles | 200 North Main Street | Los Angeles | CA | 90012 |
| Office of the City Attorney, San Diego | 1200 Third Avenue Suite 1620 | San Diego | CA | 92101 |
| Office of the City Attorney, Sacramento | 915 I Street, 4th Floor | Sacramento | CA | 95814 |

3

| Agency | Address | City | State | Zip Code |
|--------|---------|------|-------|----------|
| Office of the City Attorney, San Francisco | City Hall, Room 234<br>1 Dr. Carlton B. Goodlett Place | San Francisco | CA | 94102 |
| Office of the City Attorney, San Jose | 200 East Santa Clara Street | San Jose | CA | 95113 |

4